**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION**

| | | |
|---|---|---|
| JOSEPH SHANE TERRY, | } | |
| | } | |
| Petitioner, | } | |
| | } | |
| v. | } | Case No.: **5:16-cv-08156-RDP** |
| | } | **(5:12-cr-00455-RDP-TMP)** |
| UNITED STATES OF AMERICA, | } | |
| | } | |
| Respondent. | } | |

**MEMORANDUM OPINION**

It has been said that in the closing weeks and months of World War II, when the Axis forces became particularly desperate, they began firing everything which was available to them as part of their bombardments of the Allies. This reportedly led to the coinage of the hyperbolic phrase "everything except the kitchen sink" (or including the kitchen sink).

This case is before the court on Petitioner's Motion to Vacate, Set Aside, or Correct Sentence, filed under 28 U.S.C. § 2255. (Case No. 5:16-cv-08156-RDP ("Civil Docket"), Docs. # 1, 2). The Government has responded to Petitioner's Motion to Vacate, and Petitioner has submitted a reply. (*Id.*, Docs. # 6, 7). Petitioner also has filed several requests for discovery. (*Id.*, Docs. # 7 at 4-5, 8 at 1-6). Petitioner's Motion to Vacate is ripe for decision. It quite literally includes everything but the kitchen sink.[1] After careful review, and for the reasons explained below, the court concludes that Petitioner's Motion to Vacate is due to be denied without an evidentiary hearing, and his requests for discovery are due to be denied.

---

[1] And, to be sure, this kitchen sink approach is consistent with Petitioner's approach to his criminal case.

## I.    Procedural and Factual History

To address Petitioner's ineffective-assistance-of-counsel claims against three of his retained attorneys, the court must discuss in some detail the lengthy proceedings that occurred between his indictment in October 2012 and the Eleventh Circuit's affirmance of his convictions and sentences in August 2015.   Suffice it to say that Petitioner has gone through five sets of attorneys (including his appellate counsel) and set forth a number of frivolous and disingenuous positions in his criminal case and this litigation.   Nevertheless, the court will carefully consider each of his arguments.

### A.    The Charges Against Petitioner and Representation by Henry Frohsin and Ron Brunson

In October 2012, a grand jury indicted Petitioner on: (1) five counts of wire fraud, in violation of 18 U.S.C. § 1343; (2) five counts of knowingly making false statements to the Small Business Administration ("SBA"), in violation of 15 U.S.C. § 645(a); (3) three counts of knowingly making false statements to financial institutions, in violation of 18 U.S.C. § 1014; and (4) one count of engaging in a monetary transaction in criminally derived properly valued at over $10,000, in violation of 18 U.S.C. §§ 1957 and 2.   (Case No. 5:12-cr-00455-RDP-TMP ("Criminal Docket"), Doc. # 1).   The indictment charged Petitioner with submitting fraudulent documentation to the SBA from June 2003 to October 2008 in order to be awarded government contracts.   (*Id.* at ¶¶ 14-15).   Specifically, it alleged that Petitioner had submitted false tax returns, false tax documents, and forged performance and payment bonds, among other documents. (*Id.* at ¶¶ 16-18, 20-24).

In December 2012, attorneys Brunson, Frohsin, and Carrie Motes filed a motion to dismiss Counts One through Nine of the Indictment as time-barred under a five-year statute of limitations.   (*Id.*, Doc. # 15).   These attorneys also filed a motion to suppress evidence

discovered during a warrantless search of a residence at 320 Coulter Road, New Market, Alabama ("Coulter Road Residence"). (*See id.*, Doc. # 16). Prior to the search, law enforcement were given consent by a woman at the property, Michelle Vandergrift. (*Id.* at 1). Petitioner argued in that motion that he was the owner of the Coulter Road Residence on the date that officers searched it. (*Id.*). He contended that his purported common-law wife, Vandergrift, never resided at the Coulter Road Residence, lacked joint access or control over the Residence, and lacked common authority over the Residence. (*Id.* at 2). Therefore, he claimed that she lacked authority to consent to a search of the Coulter Road Residence. (*Id.*).

The Government responded that Counts One through Nine of the Indictment were timely because the limitations period had been tolled by the Wartime Suspension of Limitations Act ("WSLA"), 18 U.S.C. § 3287. (*Id.*, Doc. # 18 at 1). It claimed that the United States was "at war" for purposes of the WSLA once Congress authorized the use of military force in 2001 and 2002 for combat in Afghanistan and Iraq, even though there was no formal declaration of war. (*Id.* at 7-12). Moreover, it explained why the offenses charged in Counts One through Nine were within the scope of the WSLA. (*Id.* at 12-14). And, it stated that the conditions for terminating the WSLA's suspension period had not been met. (*Id.* at 14-18). In the alternative, the government explained why the limitations periods for Petitioner's charges were suspended by operation of a 2008 amendment to the WSLA. (*Id.* at 18-21).

The Government also argued that the search of the Coulter Road Residence fully comported with the Fourth Amendment because Vandergrift had consented to the search after obtaining sole authority over the Residence. (*See id.*, Doc. # 19 at 7). Alternatively, it contended that Vandergrift held common authority over the Coulter Road Residence because she had been Petitioner's common-law wife for thirteen years, Vandergrift and Petitioner had

purchased the Coulter Road Residence during that marriage, and Vandergrift had kept some personal belongings at the Residence. (*Id.*). Finally, it contended that, in any event, the consent search did not violate the Fourth Amendment because the officers conducting the search reasonably believed that Vandergrift had authority to consent to a search. (*Id.* at 7-8).

In a counseled reply brief, Petitioner argued that the WSLA did not apply to Counts One, Two, Three, Four, Five, Eight, and Nine because the offenses described in those counts occurred after the end of hostilities in Afghanistan and Iraq. (*Id.*, Doc. # 21 at 2-3). He also claimed that the WSLA did not apply to Counts Six and Seven because no binding authority had established that the WSLA applied during periods of hostility outside of a declared war, the charges resulted from a four-year investigation by law enforcement, and the investigation had not been impeded by the United States' foreign military operations. (*Id.* at 3-4).

In January 2013, the court held a suppression hearing and oral argument on Petitioner's motion to dismiss. (*Id.*, Doc. # 34). Janet Shivers, an agent with the U.S. Army's Criminal Investigation Command, testified about the circumstances surrounding Vandergrift's grant of consent to search the Coulter Road Residence. (*Id.* at 3-57). On cross-examination, Brunson asked Shivers whether she knew that the divorce decree Vandergrift presented had been awarded in a default judgment. (*Id.* at 36). Shivers testified that Vandergrift had disclosed "that she was awarded the property because [Petitioner] did not show up for court." (*Id.* at 36-37). And, she explained that another agent had examined probate records for the Coulter Road Residence and had found a copy of the divorce decree. (*Id.* at 37). She conceded, though, that she was unaware of a deed transferring the Residence to Vandergrift. (*Id.*). Brunson questioned Shivers about whether Vandergrift claimed to have lived at the Coulter Road Residence. (*Id.* at 38). Shivers responded that Vandergrift claimed to have spent time at the Residence, but did not claim to

have lived there. (*Id.*). Brunson asked Shivers whether Vandergrift had discussed a plan to change the locks on the Residence between their visit to the Residence on July 19, 2012, and the search that occurred on July 23, 2012. (*Id.* at 39) Shivers denied any knowledge of such a plan. (*Id.*).

Brunson questioned Shivers about the officers' decision to not conduct the search on July 19th after observing Petitioner's car at the Coulter Road Residence. (*Id.* at 41-42). Shivers candidly stated that they wanted to search the Residence while Petitioner was not present. (*Id.* at 43). Brunson asked whether agents found any of Vandergrift's property at the Residence, and she explained that they found some pictures of Vandergrift and her son there. (*Id.* at 48-49). She denied finding any furniture or clothing owned by Vandergrift there, but explained that she was not looking for those items but documents instead. (*Id.* at 49-50).

Mark Wilson, a special agent for the Internal Revenue Service, testified about the IRS's investigation into Petitioner. (*Id.* at 59-80). On cross-examination, Frohsin asked Wilson about a 2010 interview with Vandergrift, and Wilson affirmed that Vandergrift claimed to have never been married during that interview. (*Id.* at 66-67). Wilson also confirmed that, during her 2010 interview, Vandergrift claimed to have been separated from Petitioner for approximately three years. (*Id.* at 67-68). Wilson explained that he later obtained mortgage documents in which Vandergrift referred to Petitioner as her husband. (*Id.* at 70). Moreover, Petitioner told Wilson that "he was in a divorce battle," and Wilson saw the divorce decree prior to the search. (*Id.* at 71). Frohsin asked Wilson whether he checked court records prior to the search to determine whether a deed had been entered; Wilson testified that he had not. (*Id.* at 74).

Vandergrift testified about her relationship with Petitioner, her personal property at the Coulter Road Residence, and her use of the Coulter Road Residence with Petitioner, among other

things.  (*Id.* at 81-138).  On cross-examination, Brunson asked Vandergrift whether Petitioner

had received notice of the divorce decree, and she responded that he had been mailed a copy.

(*Id.* at 101-02).  Brunson asked her about a state-court hearing during the week before the search

where a judge had denied her a writ of possession for the Coulter Road Residence.  (*Id.* at 108).

Vandergrift explained that the judge had decided to wait before issuing a writ of possession, so

she had hired private security to obtain control of the Residence.  (*Id.*).  Vandergrift could not

recall whether she mentioned her difficulty in obtaining a writ of possession and assistance from

the Madison County Sheriff's Office to investigators during her July 19th proffer interview.  (*Id.*

at 109-10).  Nor did she recall whether she discussed her plan to provide officers access to the

Coulter Road Residence with a garage door opener, rather than a key.  (*Id.* at 110).  She

conceded, though, that she did not have a key to the Residence on July 19th, when officers first

visited the Residence.  (*Id.* at 111).  She could not recall whether she informed law enforcement

officials of her plan to change the locks at the Residence before she did so.  (*Id.* at 113).

Brunson then asked Vandergrift whether Petitioner had stayed at the Residence overnight

before, and she conceded that there were living accommodations at the Residence.  (*Id.* at 114-

15).  She testified that the Residence contained a refrigerator, sink, and toaster oven.  (*Id.* at 115).

And, she stated that Petitioner's brother and a friend had lived at the Residence for a period of

time.  (*Id.*).  She conceded that sheriffs had refused to assist her in obtaining possession of the

Residence in May 2012 due to incorrect legal papers.  (*Id.* at 118-19).  She also observed sheriffs

at the scene of the search on July 23rd.  (*Id.* at 120).  She estimated that she last spent time at the

Residence between May 2009 and the end of 2009 because she discovered Petitioner's girlfriend

would visit there in early 2010.  (*Id.* at 123).

After oral argument, the court orally ruled on both motions. The court denied Petitioner's suppression motion because it found it was reasonable for the searching officers to conclude that Vandergrift gave them valid consent to search the Coulter Road Residence. (*Id.* at 198-200). The court credited the officers' testimony as to why they decided not to search the residence on July 19th. (*Id.* at 190-91). The court found that the searching officers lacked knowledge "of any limitations the sheriff's department had de facto imposed on Miss Vandergrift or that the judge might have imposed by setting it for a hearing, continuing a hearing, staying things, allowing an appeal or any of that state court activity." (*Id.* at 191-92). Moreover, a reasonable official in their position would have been aware of the final divorce decree granting Vandergrift ownership of the Coulter Road Residence, and Vandergrift acted in accordance with that possession when she provided officers a key to the Residence on July 23rd. (*Id.* at 193). And, a reasonable official would have recognized that Vandergrift likely had common authority over the property before the divorce decree because such a decree only would have been issued if Vandergrift and Petitioner had been married. (*Id.* at 193-94).

The court also found that Vandergrift had not abandoned the Residence. First, the court determined that Vandergrift had used and visited the property before she avoided it due to her belief that Petitioner was "entertaining" another woman at the Residence. (*Id.* at 194-96). Second, the court found that no one permanently resided at the Residence. (*Id.* at 195). Several pieces of evidence buttressed that finding:

> There were no closets. The kitchen was ill-equipped for a long-term living situation. That's not to say somebody couldn't have been there, but I haven't heard any evidence to suggest that anyone regularly resided at the residence. It was more of a farm; a place for the family to visit, where recreational activities and other things could occur and that both Mr. Terry and Miss Vandergrift took advantage of that from time to time until Miss Vandergrift decided that she did not want to meet the mistress there.

(*Id.*).  Third, the court found no evidence that Vandergrift had informed the searching officers of her reasons for avoiding the Coulter Road Residence.  (*Id.* at 195-96).

The court acknowledged that Vandergrift previously had denied her marriage to Petitioner, but noted she had explained her denial was intended to protect herself from a government investigation.  (*Id.* at 196).  It concluded that Vandergrift was not a government agent at the time she gave consent because she cooperated with law enforcement for her own advantage.  (*Id.*).  And, it credited Wilson's testimony that he believed a marriage had existed between Vandergrift and Petitioner because of the existence (and his review) of the state-court judge's divorce decree.  (*Id.* at 197).  Finally, it found that the sheriff's department played no role in determining whether Vandergrift had consented validly to the search.  (*Id.* at 198-99).

With regard to the motion to dismiss, the court found that the 2008 amendments to the WSLA applied to all of the counts in the Indictment except for Count Six.  (*Id.* at 201).  The amended suspension provisions did not apply to Count Six because the limitations period for that charge had expired prior to 2008.  (*Id.* at 201-02).  Under the 2008 WSLA amendments, the court found that (1) Congress authorized the use of military force in 2001 and 2002, and (2) "hostilities had not terminated because the President had not proclaimed them to be terminated, and there'd not been a joint resolution of Congress indicating that they [were] terminated."  (*Id.* at 202).  The court recognized that Counts One through Five and Counts Seven through Nine charged Petitioner with crimes that were within the scope of the WSLA.  (*Id.*).

In January 2013, Petitioner waived his right to a speedy trial and requested additional time to review the voluminous discovery at issue.  (*Id.*, Doc. # 23).  In February 2013, the court accepted Petitioner's waiver and continued the trial to May 2013.  (*Id.*, Doc. # 24 at 2).  On April 24, 2013, the court set a pretrial conference for April 29, 2013.  (*Id.*, Doc. # 26).

On April 26, 2013, Petitioner submitted a *pro se* motion to dismiss his defense counsel for cause and to continue the trial in order to seek new counsel. (*Id.*, Doc. # 27 at 1). Petitioner claimed that Frohsin had refused to meet with him and had assigned the case to Brunson. (*Id.*). Moreover, Petitioner complained that his attorneys had endeavored to "get [him] to plead guilty" and falsely admit to committing crimes. (*Id.* at 1-2). According to Petitioner, his attorneys had failed to (1) review discovery materials and demand additional discovery required by law, (2) notify the Government of a damaged hard drive, (3) submit evidence at the suppression hearing proving Petitioner's use of the Coulter Road Residence, (4) prepare for trial or discuss trial strategy, and (5) issue subpoenas as requested by the Petitioner. (*Id.*). Petitioner wrote that his attorneys had directed witnesses with relevant information to not appear at the suppression hearing. (*Id.* at 1). Petitioner sought a continuance of the scheduled trial so that he could retain new counsel. (*Id.* at 2).

On April 29, 2013, during a conference, Brunson explained that Frohsin and he were unable to effectively communicate with Petitioner. (*Id.*, Doc. # 132 at 3). Brunson agreed that his firm could not continue to represent Petitioner. (*Id.*). The court continued Petitioner's trial and referred his motion to dismiss counsel to a Magistrate Judge. (*Id.*, Minute Entry dated April 29, 2013).

On May 14, 2013, Petitioner submitted a *pro se* motion to reopen his earlier suppression motion. (*Id.*, Doc. # 28). Petitioner argued that his suppression motion should be reheard because his attorneys had rendered ineffective assistance. (*Id.* at 1). He stated that his attorneys should have called four witnesses who could have testified about his activities at the Coulter Road Residence. (*Id.* at 2). Additionally, he insisted that counsel should have submitted documents and photographs to show that he used the building as a residence. (*Id.*). On May 17,

2013, Robert Tuten appeared on Petitioner's behalf as his attorney. (*Id.*, Doc. # 29). On May 29, 2013, the court terminated Petitioner's motion to dismiss counsel as moot because he had retained a new attorney. (*Id.*, Doc. # 33). The court terminated attorneys Brunson and Motes that day. (*Id.*, Docket Entry dated May 29, 2013).

### B.     Representation by Robert Tuten and Howell Riggs

During a May 29, 2013 conference, Tuten requested that the court rule on Petitioner's *pro se* motions. (*Id.*, Doc. # 129 at 4-5). The Government responded that Petitioner was represented by counsel when he filed his motion to reopen the suppression proceedings. (*Id.*). The court explained that none of the information attached to the *pro se* motion was likely to make a difference in its suppression ruling, but offered to allow Petitioner's new counsel to file a brief in support of the motion to rehear if there were additional arguments for suppressing the evidence from the Coulter Road Residence. (*Id.* at 5). The court acknowledged that Petitioner had advanced a claim that his prior attorneys had rendered ineffective assistance. (*Id.* at 7). But, it recalled that Brunson and Frohsin "did an excellent job at the hearing." (*Id.*). And, it recognized that "they did what they could with what they had." (*Id.*). Ultimately, the court asked Tuten to review the suppression hearing transcript and decide whether he wanted to make supplemental arguments in support of the earlier-filed suppression motion. (*Id.* at 11). Tuten agreed to review the earlier proceedings. (*Id.*).

On July 8, 2013, Tuten filed a supplement to Petitioner's *pro se* motion to reconsider. (*Id.*, Doc. # 35). Tuten argued that Vandergrift was Petitioner's "former girlfriend" and that she had relied on a void order to justify her purported consent to search the residence. (*Id.* at 1). Tuten explained that the witnesses' testimony would show that Vandergrift "had no standing to consent and knew she had no standing to consent to the warrantless search as Defendant had

resided at the residence for a long period of time with his new girlfriend and their young child." (*Id.*). Tuten recounted Petitioner's claim that Vandergrift lacked standing to consent to a search of the Coulter Road Residence, even if she retained an ownership interest in the property. (*Id.* at 2). Four days later, Tuten amended the motion to clarify the status of the divorce proceedings and explain that the divorce decree entered by the state court might only be voidable, rather than void *ab initio*. (*Id.*, Doc. # 37).

The Government responded that the four proposed witnesses had no testimony to dispute Vandergrift's authority to consent to the search. (*Id.*, Doc. # 38 at 6-8). The Government discounted Petitioner's ineffective-assistance claims because pre-trial strategy is a matter within the scope of counsel's judgment. (*Id.* at 8). Thus, defense counsel did not render ineffective assistance when they disregarded Petitioner's requests, and their actions could not rise to ineffective assistance because Petitioner's evidence was irrelevant. (*Id.* at 8-9). Finally, it explained that any subsequent action in the state-court divorce proceedings was irrelevant to what a reasonable official would have understood when Vandergrift gave consent to search the Coulter Road Residence. (*Id.* at 9-10). In August 2013, the court denied Petitioner's *pro se* and counseled motions to reopen the suppression proceedings. (*Id.*, Doc. # 43 at 2).

On August 15, 2013, Petitioner entered into a plea agreement with the Government.[2] (*Id.*, Doc. # 45). According to the plea agreement, Petitioner would plead guilty to Counts One through Five and Seven through Fourteen of the Indictment. (*Id.*, Doc. # 45 at 1). The Government stated in the factual basis that it could prove several instances of fraudulent conduct committed by Petitioner. First, Petitioner and Government Technical Services, LLC ("GTS") submitted false, inaccurate tax documents to the SBA and those documents had not been filed with the IRS. (*Id.* at 4-5). Petitioner also falsely certified that GTS was not delinquent in its tax

---

[2] The parties amended this plea agreement twice. (*See id.*, Docs. # 47, 48).

returns.  (*Id.* at 5).  Second, in 2006, Petitioner submitted an altered and forged bond to the U.S. Army in order to obtain a work contract and the surety on the face of the bond document had actually had denied GTS's bond application.  (*Id.* at 7-8).  Third, in March 2007, Petitioner submitted false and unfiled tax returns and financial statements to a FDIC-insured bank in order to obtain a $300,000 line of credit.  (*Id.* at 6).  Fourth, in October 2007, Petitioner provided a federal land bank false tax returns in order to obtain a $140,000 loan.  (*Id.* at 6-7).  Fifth, in April 2008, Petitioner provided Vandergrift false employment and tax documents that she used to obtain a $40,000 loan.  (*Id.* at 5).  Petitioner then instructed Vandergrift to wire $20,000 of the loan proceeds to a GTS subcontractor that had not been paid for work performed on a government contract.  (*Id.*).  Petitioner stipulated that the Government's factual basis was "substantially correct."  (*Id.* at 8).  The plea agreement contained a waiver of Petitioner's appeal and post-conviction rights.  (*Id.* at 13-14).  Petitioner reserved the right to challenge a sentence exceeding a statutory maximum, a sentence exceeding the guideline range calculated by the court, or any ineffective assistance of counsel.  (*Id.*).  The agreement reflected that Petitioner had taken Xanax and Benicar within the previous two days.  (*Id.* at 20).

Petitioner and Tuten also completed an advice of rights certification.  (*Id.*, Doc. # 48). By initialing the certification, Petitioner represented that he understood what would occur at the change of plea hearing, what substantive rights he would give up by pleading guilty, what charges and penalties he faced, and that the court was not bound by the terms of the plea agreement.  (*Id.* at 1-9).

On August 15, 2013, the court held a plea hearing.  (*Id.*, Doc. # 61 at 1).  Petitioner confirmed under oath that he had discussed the plea agreement with counsel before signing it and understood the information reflected in the advice of rights certification.  (*Id.* at 4).  He denied

taking or receiving any medication that could affect his ability to understand what occurred during the hearing. (*Id.*). He confirmed that he could understand the court's statements to him and could communicate with counsel. (*Id.* at 5). Tuten informed the court that he had received adequate time to investigate the charges, and that he had been in "constant contact" with Petitioner and other attorneys about the case during the prior week. (*Id.* at 5-6). Immediately following Tuten's statement, the court asked Petitioner whether he "agree[d] that [he] had adequate time to consult with [his] attorney concerning these matters." (*Id.* at 6). Petitioner confirmed that he had received adequate time for consultation and that he was "fully satisfied" with Tuten's representation and advice. (*Id.*). Petitioner testified that he understood the rights he would be waiving by pleading guilty. (*Id.* at 8-9). While the court explained the charges at issue to Petitioner, he informed the court that he did not understand one of the questions presented to him. (*Id.* at 10).

The court asked Tuten whether Petitioner's questions about the plea agreement had been answered, and Tuten explained that he had answered "many, many questions" about the plea agreement. (*Id.* at 18-19). Petitioner testified that he had personally initialed and signed the plea agreement, he had received sufficient time to discuss it with Tuten, and Tuten had answered his questions about the agreement to his satisfaction. (*Id.* at 19-20). Petitioner confirmed his understanding that the facts outlined in the factual basis would be accepted as true and correct. (*Id.* at 20-21). Moreover, Petitioner confirmed that he understood the appeal and post-conviction waiver signed in the plea agreement. (*Id.* at 22-23). Petitioner stated that he was pleading guilty because he was in fact guilty of the charges against him in the Indictment. (*Id.* at 31). The court asked Petitioner at the end of the hearing whether he had heard and understood everything that occurred; Petitioner confirmed that he had. (*Id.* at 37). The court ultimately found that

Petitioner was competent to enter the guilty plea, aware of the consequences of his knowing and voluntary plea, and entered a plea supported by an independent basis. (*Id.* at 41). Thus, the court accepted Petitioner's plea and adjudged him guilty of Counts One through Five and Seven through Fourteen. (*Id.* at 41-42).

On August 21, 2013, Howell Riggs entered a notice of appearance on Petitioner's behalf. (*Id.*, Doc. # 51).

In November 2013, Tuten moved for a continuance of sentencing. (*Id.*, Doc. # 52). He explained that Petitioner retained Riggs to assist in calculating the loss amount and other mitigation matters. (*Id.* at 1). However, Riggs suffered from medical conditions that significantly restricted his ability to work. (*Id.* at 2). Tuten anticipated presenting expert testimony regarding the loss that the Government actually suffered. (*Id.* at 1). The Government opposed a continuance because Tuten could have retained an expert and because it believed that the motion continued a pattern of delay instituted by Petitioner. (*Id.*, Doc. # 53 at 2-3). Tuten also sought additional time to file objections to the Presentence Report ("PSI") in light of Riggs' illness and Petitioner's failure to communicate with him. (*Id.*, Doc. # 55).

In December 2013, Petitioner, acting *pro se*, requested leave to discharge counsel and continue the sentencing hearing.[3] (*Id.*, Doc. # 56). Petitioner stated that Riggs was unable to complete needed documents and that he was negotiating with another defense attorney to represent him. (*Id.* at 1). He notified the court that he might file a motion to withdraw his guilty plea because he did not understand the instructions and legal advice Tuten had given to him due to his medication. (*Id.*). He explained that his relationship with Tuten had broken down irretrievably. (*Id.*).

---

[3] Petitioner signed the *pro se* motion on November 25, 2013, and it was filed by the court on December 6, 2013. (*See* Criminal Docket, Doc. # 56).

On December 2, 2013, the court held a status conference with counsel and Petitioner. (*Id.*, Doc. # 63 at 1). Petitioner explained that he did not intend for the motion to discharge counsel to be his motion to withdraw the plea. (*Id.* at 4). He stated that he was trying to be "open and honest" with the court by relaying his concerns with the plea itself rather than seeking a continuance of sentencing for Riggs' illness. (*Id.* at 5). The court asked Petitioner why he was considering withdrawing the plea when he had failed to inform the court about the medication issues during the plea hearing. (*Id.* at 5-6). Petitioner claimed that he had lied about his guilt of the charges during the plea hearing because he was suicidal and wanted to take the burden of the case off of his family. (*Id.* at 7-8). Petitioner stated that he did not want Riggs to withdraw from the case, and Riggs expressed his intent to continue representing Petitioner. (*Id.* at 8). Tuten acknowledged Petitioner's belief that the attorney-client relationship had broken down, and Petitioner confirmed that he wanted Tuten to withdraw from the case. (*Id.* at 8-9). The Government then expressed its concern that Riggs faced a conflict of interest that should preclude him from representing Petitioner. (*Id.* at 9).

At that conference, the court referred the motion to discharge counsel to the assigned Magistrate Judge and continued the sentencing hearing. (*Id.* at 10). The court warned Petitioner that it was concerned about him delaying the proceedings and misleading the court, that he might lose his acceptance of responsibility reduction, and that his counsel needed to warn him about the risks of a trial. (*Id.* at 10-11). The undersigned also advised Petitioner that he remembered the consent hearing "very well." (*Id.* at 14). Thereafter, Riggs assured the court that he would be working with whomever Petitioner hired and that his medical issues would not prevent him from assisting defense counsel. (*Id.* at 15).

On December 9, 2013, Tuten explained to a Magistrate Judge that he faced a conflict of interest with Petitioner and that the case could create additional conflicts of interest between Petitioner and himself. (*Id.*, Doc. # 137 at 2-3). Riggs stated that he had been hired for a particular purpose and that he was not a criminal attorney. (*Id.* at 5-6). The Government explained that it believed Riggs faced a conflict of interest because Petitioner had agreed to cooperate with the Government in his plea agreement, and Riggs represented one individual that Petitioner could disclose information about. (*Id.* at 13). The Magistrate Judge ordered Petitioner to retain substitute counsel within seven days. (*Id.* at 18). The court terminated Tuten as Petitioner's attorney on December 10, 2013. (*Id.*, Docket Entry dated Dec. 10, 2013).

### C. Petitioner's Motion to Withdraw Guilty Plea

In January and February 2014, three attorneys entered notices of appearance for the limited purpose of determining whether a meritorious ground existed for filing a motion to set aside the plea agreement. (*Id.*, Docs. # 64, 65, 68). In March 2014, they filed a motion to withdraw the plea on Petitioner's behalf. (*Id.*, Doc. # 77). In that motion, Petitioner argued that he was not competent to enter a guilty plea on the date of the plea hearing because the medications he used affected his cognitive functions. (*Id.* at 5-6). He contended that defense counsel (Tuten) was unaware that he had used prescription medication because counsel did not correct his misstatement to the court during the plea hearing. (*Id.* at 6-7). And, counsel could not have been aware of how the medication affected Petitioner's cognition. (*Id.* at 7).

The Government responded that Tuten had represented Petitioner during the plea proceedings and had not observed Petitioner in any catatonic state. (*Id.*, Doc. # 79 at 14). Additionally, Petitioner's plea colloquy foreclosed his competency claim because he answered the court's questions, did not slur his speech or stumble, and did not appear confused. (*Id.* at 15).

16

It criticized Petitioner's reliance on testimony from experts who examined him seven months after the plea hearing. (*Id.* at 16-17). And, it pointed out Petitioner's history of delay tactics during the litigation. (*Id.* at 17).

In May 2014, the court held an evidentiary hearing on the motion to vacate. (*Id.*, Doc. # 94 at 1). Petitioner's counsel objected to Tuten testifying due to attorney-client privilege. (*Id.* at 4). Counsel agreed that Tuten could testify about Petitioner's ability to communicate, but not about confidential matters or communications made between Tuten and Petitioner. (*Id.* at 5). The court deferred its ruling on the attorney-client privilege issues until later in the hearing. (*Id.* at 11-12).

Dr. Jimmie Valentine, a pharmacologist, testified that Petitioner's prescribed migraine medication could have interacted with Xanax to depress his central nervous system and prevent him from thinking logically. (*Id.* at 21-22, 30-31). Valentine opined that a person taking those drugs together would "not [be] able to totally be focused and functioning as needed." (*Id.* at 33). Valentine conceded that he had not reviewed the plea colloquy transcript. (*Id.* at 34). Valentine also explained that his expert testimony relied on Petitioner's self-reported medication use. (*Id.* at 37).

Dr. William Freeman, a psychiatrist, testified that Petitioner suffered from stress-induced depression and anxiety that led him to overuse his prescription medications. (*Id.* at 39, 43-44). Petitioner recalled suffering periods of amnesia prior to the plea colloquy and could not recall the events that occurred on the date of the plea colloquy. (*Id.* at 44-45). Freeman explained that Petitioner's mental functioning was significantly impaired at the time of the plea hearing and that he likely was unable to weigh the benefits and the risks of the plea. (*Id.* at 50). Freeman

testified that observers at the plea hearing might not have noticed the symptoms of Petitioner's mental lapse. (*Id.* at 50-51).

On cross-examination, Freeman acknowledged that his expert opinion likely would change if Petitioner was not taking his self-reported combination of medications. (*Id.* at 52). According to Freeman, Petitioner could have appeared distracted and could have failed to respond to questions sharply, but the observers at the plea hearing lacked knowledge of Petitioner's undiminished mental capacity because they all met him during the criminal proceedings. (*Id.* at 54). When asked if Petitioner's request for a change to the plea agreement indicated his competency to enter the plea, Freeman responded that the request might reflect a lucid interval. (*Id.* at 57-58). Freeman also opined that Petitioner could have given rote responses to questions during a blackout or amnestic episode. (*Id.* at 75). He believed that it would be less likely for a person suffering such an episode to state that he did not understand a question, as occurred during the plea hearing. (*Id.* at 76).

Petitioner testified that he wished to withdraw his plea because he lacked good judgment on the date of the plea hearing and he was "clearly innocent of the charges." (*Id.* at 117). According to Petitioner, he did not remember discussions about a plea agreement in August 2013. (*Id.* at 118-19). He hated taking medication, but he sometimes took more medication than he had been prescribed. (*Id.* at 120). He could not recall how much medication he took on the date of the plea hearing, driving to the courthouse, parking at the courthouse, or attending the hearing in the courthouse. (*Id.* at 123). Nor did he recall a blog comment he wrote after the hearing. (*Id.* at 127-28). He explained that he had attributed the guilty plea to stress and depression during the December 2013 conference because he did not realize the side effects of his medication until he spent nine days in jail during bond revocation proceedings. (*Id.* at 126).

On cross-examination, Petitioner testified that he could not recall a conversation he had with his probation officer the day after entering the plea. (*Id.* at 129-30). Petitioner could not remember whether he complained about his rejection of an earlier plea deal in February 2014. (*Id.* at 130-31). Petitioner recalled asking the court to reopen the suppression hearing, but he did not know if Tuten reviewed the suppression proceedings and filed a motion on his behalf. (*Id.* at 144-45). In responding to the court's questions, Petitioner testified that he remembered his first conversations with Tuten after he retained Tuten, but did not remember the conversations leading up to the plea hearing. (*Id.* at 150). He explained that he remembered general activities he conducted, but did not remember specific details. (*Id.* at 152).

Prior to Tuten's testimony, Petitioner's counsel attempted to distinguish their claim that Tuten failed to discern Petitioner's amnestic condition from an ineffective-assistance claim against Tuten. (*See id.* at 169-71). Petitioner's counsel acknowledged the "fine line" between the arguments they were raising and an ineffective-assistance argument. (*Id.* at 174). Ultimately, the court decided to address attorney-client privilege issues on a question-by-question basis. (*Id.* at 179).

Tuten testified that he worked extensively with Riggs during trial preparation. (*Id.* at 184). Tuten and Riggs met with Petitioner two to three times a week, and they met with him every day during the month prior to the scheduled trial in August 2013. (*Id.*). During those meetings, Petitioner responded to Tuten's questions appropriately, asked follow-up questions, and fully discussed the contracts at issue. (*Id.* at 184-85). Tuten believed that Petitioner had sophisticated knowledge about the government contracts at issue. (*Id.* at 187).

Two weeks before trial, Petitioner told Tuten that he wished to obtain a plea bargain similar to the one previously offered. (*Id.* at 188, 190). Tuten asked Petitioner why he changed

his mind, and Petitioner provided him a reasoned answer. (*Id.* at 191). Tuten did not perceive of any conduct that caused him to doubt Petitioner's understanding of the plea. (*Id.*). Tuten testified that, during their pre-trial meetings, Petitioner was able to recall facts discussed during earlier meetings. (*Id.* at 192). Tuten discussed Petitioner's Xanax use with him. (*Id.* at 193). Following the plea hearing, one of the prosecutors discussed Petitioner's blog comment with him, and Petitioner acknowledged that he had written the comment. (*Id.* at 200). Petitioner conceded that he should not have written the comment. (*Id.*). At the end of the Government's examination, Petitioner's counsel agreed with the court that (1) none of Tuten's testimony implicated a privilege, (2) the court had not overruled any of Petitioner's objections, and (3) Tuten's testimony only related to observations about Petitioner's ability to communicate. (*Id.* at 206-07). The court accordingly ruled that Petitioner's express or implied waiver of the attorney-client privilege only related to his ability to observe and communicate with counsel. (*Id.* at 207).

On cross-examination, Tuten testified that Petitioner sometimes asked the same question several times. (*Id.* at 207). He denied possessing any qualifications to evaluate Petitioner's mental competency. (*Id.* at 208).

After counsels' oral arguments, the court first found that Petitioner was represented by counsel at the plea hearing. (*Id.* at 252). Second, the court explained that it recalled the plea colloquy and that Petitioner appeared "very engaged" during that hearing. (*Id.* at 254-55). The court credited Tuten's testimony about Petitioner's demeanor and responsiveness because Tuten devoted significant time to the case, communicated with Petitioner at that time, and described an incident where Petitioner sought assistance in a child custody matter after the plea colloquy. (*Id.* at 256). The court discredited Petitioner's testimony that he did not recall writing the blog comment, based on Tuten's testimony to the contrary. (*Id.* at 257-58). It also discredited

Petitioner's testimony that he did not recall the plea process or the plea hearing. (*Id.* at 258-59). It explained that the drug interaction described by Valentine should have resulted in some effect on Petitioner's ability to respond to questioning, and the court recalled no such adverse effect. (*Id.* at 260). It discounted Freeman's testimony because that testimony necessarily relied on Petitioner's self-report. (*Id.* at 261). Ultimately, the court concluded that Petitioner knowingly and voluntarily made his guilty plea, that he understood the nature and consequences of the plea, and that his testimony to the contrary was incredible and given in bad faith. (*Id.* at 263-64). It overruled Petitioner's motion to set aside the plea. (*Id.* at 265).

## D. Petitioner's Sentencing and Appeal

In May 2014, Petitioner's retained attorneys sought to withdraw because Petitioner declined to retain them for further proceedings. (*Id.*, Doc. # 91). The court appointed Petitioner an attorney for further proceedings. (*Id.*, Doc. # 92). In July 2014, the court sentenced Petitioner to a total sentence of 108 months' imprisonment. (*Id.*, Doc. # 127 at 44).

On appeal, Petitioner challenged the court's denial of his motion to withdraw the guilty plea, the denial of his motion to dismiss Counts One through Five and Seven through Nine on statute-of-limitations grounds, the application of an obstruction-of-justice guideline enhancement, and the denial of an acceptance-of-responsibility guideline reduction. (*Id.*, Doc. # 149 at 3). The Eleventh Circuit affirmed the denial of Petitioner's motion to withdraw the plea because "[t]he district court's decision to credit its own and [Tuten's] first-hand impressions of [Petitioner's] competence, rather than [Petitioner's] self-serving testimony and the testimony of his medical experts who lacked any first-hand knowledge of his mental state, was not clearly erroneous." (*Id.* at 4-5). It held that Petitioner waived his statute-of-limitations claims when he

entered a knowing, voluntary, and unconditional guilty plea to the charges. (*Id.* at 5-6). Finally, it held that Petitioner's appeal waiver barred review of his sentencing challenges. (*Id.* at 6).

## II.    Discussion

A federal prisoner may file a motion to vacate his or her sentence "upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255(a). It is well settled that "to obtain collateral relief[,] a prisoner must clear a significantly higher hurdle than would exist on direct appeal." *United States v. Frady*, 456 U.S. 152, 166 (1982). Here, Petitioner seeks relief on the ground that he received ineffective assistance of counsel from Brunson, Tuten, and Riggs.

Ineffective-assistance-of-counsel claims are governed by the standard set forth in *Strickland v. Washington,* 466 U.S. 668 (1984). In *Strickland*, the Supreme Court established a two-prong test for adjudicating ineffective-assistance-of-counsel claims; both prongs of the test must be met for a petitioner to succeed. *Id.* at 687. First, a petitioner must show that counsel's performance was deficient, *i.e.*, the performance was outside the range of professionally competent assistance. *Id.* The proper measure of an attorney's performance is "reasonableness under prevailing professional norms." *Id.* at 688. Unless a petitioner can rebut the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," he or she cannot show that counsel's performance was constitutionally deficient. *Id.* at 689. "The test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. [The court asks] only whether some reasonable lawyer . . . could have acted, in the circumstances, as defense counsel acted . . . ." *White v.*

*Singletary*, 972 F.2d 1218, 1220 (11th Cir. 1992); *see also Waters v. Thomas*, 46 F.3d 1506, 1514 (11th Cir. 1995) (*en banc*) (stating that "perfection is not the standard of effective assistance"). When an ineffective-assistance claim challenges an attorney's choice to pursue one avenue of argument over another avenue, the attorney's choice "cannot be adjudged incompetent . . . as long as the approach taken 'might be considered sound trial strategy.'" *Chandler v. United States*, 218 F.3d 1305, 1314 (11th Cir. 2000) (*en banc*) (quoting *Darden v. Wainwright*, 477 U.S. 168, 186 (1986)). The court affords experienced trial counsel a stronger presumption of reasonably effective performance. *Id.* at 1316.

Second, a petitioner must establish prejudice, such that there is a reasonable probability that, absent counsel's errors, the outcome of the proceeding would have been different. *Strickland*, 466 U.S. at 687; *Chandler*, 218 F.3d at 1312-13. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. A petitioner alleging prejudice resulting from his or her acceptance of a guilty plea must demonstrate a reasonable probability that he or she would have gone to trial rather than enter the plea, but for counsel's errors. *Lafler v. Cooper*, 566 U.S. 156, 163 (2012). And, the petitioner's decision to reject the plea would have to be "rational under the circumstances." *Padilla v. Kentucky*, 559 U.S. 356, 372 (2010). Because Petitioner must meet both parts of the *Strickland* test, the court need not address the performance prong if he cannot meet the prejudice prong, and vice versa. *Holladay v. Haley*, 209 F.3d 1243, 1248 (11th Cir. 2000).

**A.      Petitioner Has Not Demonstrated Brunson's Deficient Performance at the Suppression Hearing or Any Prejudice He Suffered from Brunson's Decisions During the Suppression Proceedings**

Petitioner first argues that Brunson rendered ineffective assistance by failing to call witnesses and proffer evidence that Petitioner wanted him to present. (Civil Docket, Doc. # 2 at

2).  After careful review, the court finds that this claim fails to meet both the performance and prejudice prongs for an ineffective-assistance claim.

First, Petitioner has failed to show that Brunson performed deficiently by failing to call the witnesses and submit the evidence that Petitioner later presented to the court.  (*See generally* Criminal Docket, Doc. # 28).  As explained above, the Government argued that Vandergrift provided sufficient consent for officers to search the Coulter Road Residence and that the officers reasonably relied upon her consent to enter and search the premises.  (*See id.*, Doc. # 19 at 7-8).  Vandergrift showed the officers a divorce decree and explained to them that it granted her sole possession of the Coulter Road Residence.  (*Id.*, Doc. # 34 at 36-37).  Brunson and his co-counsel sought to undermine that position by asking on cross-examination, among other questions, (1) whether the officers knew of Vandergrift's efforts to change the locks at the Residence between the attempted search and the completed search (*id.* at 39), (2) why the officers decided against a search on July 19, 2012, when Petitioner's vehicle was parked at the Residence (*id.* at 41-43), and (3) whether Vandergrift informed the officers of her difficulties in obtaining possession of the Coulter Road Residence (*id.* at 109-10).  Brunson then argued that the facts available to the searching officers would not have led a reasonably cautious person to believe that Vandergrift held sole or common authority over the Coulter Road Residence.  (*Id.* at 145-46).  He contended that the searching officers should have been more cautious because they were aware of a marital dispute between Vandergrift and Petitioner.  (*Id.* at 150).  But, the court ultimately found Petitioner's arguments for suppression unconvincing because the officers' reliance on the divorce decree presented by Vandergrift -- and the underlying presumption that she would have possessed common authority over the Residence during her marriage with Petitioner -- was reasonable.  (*See id.* at 193-94, 198).

Brunson's decision not to call the witnesses identified by Petitioner and not to submit his proffered evidence is a strategic decision that the court "will seldom, if ever, second guess." *Campbell v. United States*, 891 F.3d 940, 947 (11th Cir. 2018) (quoting *Waters*, 46 F.3d at 1512). Moreover, Brunson's strategy during the suppression hearing was sound because it was geared toward directly challenging the Government's justification for determining there was valid consent to conduct a search. That is, Brunson attempted to cast doubt on the propriety of Vandergrift's actions in order to show that a reasonable officer would have done more to confirm Vandergrift's authority over the Coulter Road Residence before conducting the consent search. Petitioner's motion to vacate does not suggest that his witnesses and evidence would have advanced that argument. Indeed, Petitioner proffered his witnesses and evidence to show that he had resided in the Coulter Road Residence and that others had used it as a residence. (Criminal Docket, Doc. # 27 at 1-2). But, in context, that argument would have been superfluous. Even if Petitioner had prevailed on that factual issue, the court's analysis would not have changed significantly because the additional evidence would not have addressed whether Vandergrift had authority over the Residence and/or abandoned it. The additional evidence also would have had no effect on the officers' reasonable reliance on the divorce decree presented to them by Vandergrift. Simply put, the court is convinced that a reasonable attorney could have chosen to pursue Brunson's strategy for suppressing the evidence from the consent search and could have chosen to not introduce Petitioner's additional evidence, especially given Brunson's substantial criminal litigation experience. *See Chandler*, 218 F.3d at 1316. (*See also* Criminal Docket, Doc. # 142 at 9-10) (Magistrate Judge's statements that Brunson "was a long-time white collar crime prosecutor for the U.S. Attorney's Office").

Second, Petitioner has not shown a reasonable probability of a different outcome if Brunson had presented the additional witnesses and evidence at the suppression hearing. Because this ineffective-assistance claim concerns counsel's alleged failure to competently litigate a Fourth Amendment claim, Petitioner must "prove that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence." *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986) (quoted in *Campbell*, 891 F.3d at 947). "It is well-settled in this Circuit that a petitioner cannot establish an ineffective assistance claim simply by pointing to additional evidence that could have been presented." *Van Poyck v. Fla. Dep't of Corr.*, 290 F.3d 1318, 1324 (11th Cir. 2002). The evidence Petitioner has presented would have been immaterial to the suppression motion because the court's denial of the suppression motion rested on the officers' reasonable conclusions about Vandergrift's authority to consent to the search. (*See* Criminal Docket, Doc. # 34 at 198-200). Petitioner argues that the submitted photographs show that officials used a tow truck to enter the Coulter Road Residence. (Civil Docket, Doc. # 2 at 2). But, the photographs in the record are not clear enough to show whether anything blocked entry into the Residence. (*See* Criminal Docket, Doc. # 28-1 at 4-10). Moreover, the court finds that the proffered additional evidence would not have changed its ruling on the suppression motion. Indeed, the court actually considered this evidence after Brunson's departure from the case, but ultimately denied Petitioner's *pro se* and counseled motions to reopen the suppression proceedings. (*Id.*, Doc. # 43 at 2). Accordingly, Petitioner has failed to show that his Fourth Amendment challenge to the search would have been meritorious if Brunson had presented the additional evidence. In addition, Petitioner has not stated anywhere in his habeas filings that he would have foregone his plea and gone to trial, but for Brunson's ineffective assistance during the suppression hearing.

*Lafler*, 566 U.S. at 163.  Therefore, he cannot show that Brunson's alleged deficient performance caused actual prejudice.

**B.**      **Petitioner Has Not Demonstrated Brunson's Deficient Performance in Arguing for Dismissal of the Allegedly Time-Barred Claims, and Petitioner Was Not Prejudiced by Counsel's Argument**

Petitioner contends that Brunson should have argued that the WSLA was inapplicable to Petitioner's criminal charges because Petitioner did not perform contract work pertaining to a war.  (Criminal Docket, Doc. # 2 at 2).  The Government responds that this claim fails because Petitioner has not explained what a "proper" argument would have been.  (*Id.* Doc. # 6 at 17).  And, it notes that Brunson's arguments convinced the court to dismiss one count.  (*Id.*).  The court concludes that Petitioner has not shown deficient performance or prejudice with respect to this claim.

Petitioner cannot show that Brunson departed from the wide range of reasonably effective assistance by failing to present Petitioner's novel argument about the scope of the WSLA.  The *Strickland* standard does not require counsel to anticipate changes in the law.  *Jackson v. Herring*, 42 F.3d 1350, 1359 (11th Cir. 1995).  Nor is counsel required to pursue "claims which he reasonably believes to be of questionable merit."  *Id.*  Here, Petitioner has not pointed to any prior precedent limiting the application of the WSLA to crimes directly related to a war or use of military force. Although one provision of the WSLA pertains to crimes connected with or related to the use of military force,[4] Petitioner provides no binding authority for extending such a

---

[4]   The WSLA tolls the statute of limitations for criminal offenses "committed in connection with the negotiation, procurement, award, performance, payment for, interim financing, cancellation, or other termination or settlement, of any contract, subcontract, or purchase order *which is connected with or related to the prosecution of the war or directly connected with or related to the authorized use of the Armed Forces, or with any disposition of termination inventory by any war contractor or Government agency*."  18 U.S.C. § 3287 (emphasis added). Petitioner's criminal charges fell within the scope of the WSLA because the Indictment charged him with fraud or attempted fraud against a federal agency.  The clause of the WSLA that the Government relied upon in Petitioner's case is different than the clause quoted above, and the italicized limitation emphasized above is not present in that clause.

condition to all provisions of the WSLA. Indeed, binding case law issued after the court's ruling on Petitioner's motion to dismiss weighs against Petitioner's new argument. That is, since this court's ruling, the Supreme Court has explained that the WSLA "suspends the statute of limitations for 'any offense' involving fraud against the Federal Government." *Kellogg Brown & Root Servs., Inc. v. United States ex rel. Carter*, 135 S. Ct. 1970, 1974 (2015). The Supreme Court did not limit the WSLA's application to fraud charges directly connected with or related to a military effort. *See id.* Similarly, the Eleventh Circuit has indicated that the WSLA applies to fraud offenses against a federal agency without regard to whether the fraud offense was related to a war effort or use of military force. *See United States v. Frediani*, 790 F.3d 1196, 1200 (11th Cir. 2015). The court of appeals quoted the WSLA as follows:

> When the United States is at war or Congress has enacted a specific authorization for the use of the Armed Forces, as described in section 5(b) of the War Powers Resolution, the running of any statute of limitations applicable to any offense ... involving fraud ... against the United States or any agency thereof ... by conspiracy or not ... shall be suspended until 5 years after the termination of hostilities as proclaimed by a Presidential proclamation, with notice to Congress, or by a concurrent resolution of Congress.

*Id.* (quoting 18 U.S.C. § 3287). While neither *Kellogg Brown & Root* nor *Frediani* specifically address Petitioner's novel argument, their discussions of the WSLA appear to foreclose Petitioner's proposed limitation on the scope of the statute. Ultimately, because Petitioner's ineffective-assistance claim rests on an argument for extending the law, he has failed to show that Brunson rendered ineffective assistance by not presenting this challenge to the Government's invocation of the WSLA.

Moreover, Petitioner has failed to show a reasonable likelihood of a different result if Brunson had raised Petitioner's proposed WSLA argument. The plain language of the WSLA does not limit its application to fraud offenses related to a war effort or use of military force. 18

U.S.C. § 3287 (tolling the statute of limitations for offenses "involving fraud or attempted fraud against the United States or any agency thereof in any manner, whether by conspiracy or not"). And, Petitioner has not provided any authority to support such a limitation. While *Kellogg Brown & Root* and *Frediani* were issued after the court's ruling on the motion to dismiss, both cases describe the WSLA in a manner that comports with its plain language. And, again, Petitioner has not claimed that he would have foregone his guilty plea and insisted on a trial if Brunson had made this statute-of-limitations argument. *Cf. Lafler*, 566 U.S. at 163. Thus, this ineffective-assistance claim also fails on prejudice grounds.

      **C.**     **Even If Petitioner's Counsel Refused to Cross-Examine Government Personnel, as Alleged in Petitioner's Motion to Vacate, Petitioner Cannot Show Prejudice Based on that Refusal**

Petitioner claims that, prior to his withdrawal from the criminal case, Brunson communicated his refusal to cross-examine any government personnel. (Civil Docket, Doc. # 2 at 2). Petitioner provides no evidence to support this charge. Moreover, Petitioner included this claim in an addendum to his Motion to Vacate, rather than the Motion to Vacate itself, so this claim has not been made under penalty of perjury. (*See generally id.*, Doc. # 2). Given Petitioner's history of untruthfulness with the court (summarized in the procedural and factual history above) and the fact that he has not tendered this assertion in any evidentiary form, the court has serious doubts that Brunson made any such statement to Petitioner. Regardless, and in any event, the court agrees with the Government that this claim fails because Petitioner cannot show prejudice from Brunson's alleged communication, and the court need not conduct an evidentiary hearing to consider the credibility of this claim.

Even assuming that Brunson refused to cross-examine government personnel at a trial, the court still must determine whether the outcome of the proceedings would have been different

if Brunson had been willing to cross-examine such witnesses.[5] The court finds no substantial likelihood of a different result because the court did not force Petitioner to go to trial while represented by Brunson. Rather, the court allowed Brunson to withdraw from the case, and Petitioner hired Tuten in his stead. Thereafter, the court permitted Tuten to supplement Petitioner's motion to reopen the suppression hearing (Criminal Docket, Doc. # 35), and Tuten filed two trial-related motions on Petitioner's behalf. (*Id.*, Docs. # 31, 36). More importantly, after Tuten entered his notice of appearance, the court continued Petitioner's trial for nearly three months so that Tuten would have enough time to review the discovery materials and prepare for trial. (*Id.*, Doc. # 32) (order dated May 28, 2013 that set Petitioner's trial for August 26, 2013). Petitioner decided to plead guilty shortly before trial as Tuten was preparing to go forward with the trial. (*Id.*, Doc. # 94 at 188, 190). Notably, Petitioner has not claimed that he would have refused the offered plea and gone to trial instead if Brunson had agreed to Petitioner's preferred trial strategy. *Cf. Lafler*, 566 U.S. at 163. Because the court granted Petitioner's motion to retain new counsel after his relationship with Brunson broke down, and then granted his new counsel the opportunity to both assess and request reconsideration of the order on the motion to suppress, and finally, gave substitute counsel more than enough time to prepare for trial, Petitioner cannot show prejudice from Brunson's alleged refusal to cross-examine certain witnesses at trial.

---

[5] To be clear, this is not a case where Petitioner can show prejudice by demonstrating that the proceeding was "fundamentally unfair or unreliable." *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993). The Supreme Court has limited that prejudice standard to situations where "it would be unjust to characterize the likelihood of a different outcome as legitimate prejudice," such as when counsel could have changed a trial's result by raising an erroneous interpretation of law or by presenting perjured testimony. *Lafler*, 566 U.S. at 167 (internal quotations omitted).

### D.	Petitioner Has Not Stated Any Prejudice He Suffered From Tuten's Alleged Performance Deficiencies

Petitioner claims that Tuten lied during the evidentiary hearing on his motion to withdraw the plea. (Criminal Docket, Doc. # 2 at 2). According to Petitioner, Tuten rarely met with him, failed to interview or subpoena any witnesses, and failed to file a subpoena to obtain evidence. (*Id.*). The Government responds that this ineffective-assistance claim fails as a matter of law because it merely presents conclusory allegations of ineffective assistance. (*Id.*, Doc. # 6 at 21). The court agrees. But even though Petitioner's allegations against Tuten are conclusory, the court finds that Petitioner cannot show prejudice from Tuten's alleged pretrial failures because his averments in this Motion to Vacate are contradicted by his testimony under oath during the plea colloquy.

"[W]hen a defendant makes statements under oath at a plea colloquy, he bears a heavy burden to show his statements were false." *United States v. Rogers*, 848 F.2d 166, 168 (11th Cir. 1988). "There is a strong presumption that the statements made during the [plea] colloquy are true." *United States v. Medlock*, 12 F.3d 185, 187 (11th Cir. 1994). Here, Petitioner testified during the colloquy that he had received adequate time to consult with Tuten and that he was satisfied with Tuten's representation and advice. (Criminal Docket, Doc. # 61 at 6). Moreover, Petitioner offered this testimony after Tuten discussed the several conferences they had together, and Petitioner could have disputed Tuten's representations to the court at that time. (*See id.* at 5-6). Petitioner later confirmed during the colloquy that he was pleading guilty because he was in fact guilty of the charges made in the Indictment. (*Id.* at 31). Petitioner's assertions during the plea colloquy refute his current claim that Tuten failed to meet with him or adequately pursue evidence, and Petitioner has not met his burden to show that his testimony during the colloquy

was false.[6]  *Medlock*, 12 F.3d at 187; *Rogers*, 848 F.2d at 168.  Moreover, Petitioner has not demonstrated prejudice from Tuten's alleged deficiencies because he has not claimed anywhere in his filings that he would have foregone the plea and gone to trial if Tuten had acted otherwise. *Cf. Lafler*, 566 U.S. at 163.  Nor would the court find such a decision to go to trial rational, given Petitioner's testimony that he pled guilty because he actually was guilty of the charges.  *Cf. Padilla*, 559 U.S. at 372.  For these reasons, Petitioner fails to show that he suffered prejudice from Tuten's alleged conduct, and this ineffective-assistance claim is due to be denied.

E.    **Petitioner's Challenge to Tuten's Testimony at the Plea Withdrawal Hearing is Barred From Review by Procedural Default and the Terms of Petitioner's Collateral-Attack Waiver**

In his Motion to Vacate, Petitioner complains that Tuten voluntarily testified against him at the plea withdrawal hearing when he had fully paid Tuten and had not raised an ineffective-assistance claim against him at that time.  (Civil Docket, Doc. # 2 at 2).  In its opposition brief, the Government first argues that the claim is procedurally defaulted because Petitioner failed to raise it on appeal when he could have done so.  (*Id.*, Doc. # 6 at 23-24).  The Government also contends that this claim is barred by Petitioner's collateral-attack waiver in the plea agreement.  (*Id.* at 24).  Petitioner has not responded to the Government's procedural-default or collateral-attack waiver arguments in his reply brief.  (*See id.*, Doc. # 7).

As an initial matter, the court must determine whether or not this claim is an ineffective-assistance claim against Tuten.  An ineffective-assistance claim is one "in which the defendant is deprived of a fair trial because the lawyer handles the case unreasonably, [usually] either by performing incompetently or by not devoting full effort to the defendant, [especially] because of a conflict of interest."  *Assistance of Counsel*, Black's Law Dictionary (10th ed.

---

[6]  The court reiterates that (1) it has rejected Petitioner's claim that he has no memory of the plea colloquy proceedings, and (2) Petitioner raises his charges against counsel in an addendum to the Motion to Vacate that is not under oath.

2014). Petitioner's challenge to Tuten's testimony in May 2014 does not concern Tuten's handling of the case because Tuten possessed no responsibility over the case once the court terminated him in December 2013. His conduct could not have fallen below the range of objectively reasonable professional assistance because he was not responsible for providing Petitioner legal assistance when the plea withdrawal hearing occurred. *Cf. Strickland*, 466 U.S. at 688 (describing performance standard that an attorney must violate in order to justify an ineffective-assistance claim). Because the court terminated Tuten's representation of Plaintiff nearly five months before the plea withdrawal hearing, Petitioner's challenge to Tuten's testimony during that hearing cannot be classified as an ineffective-assistance claim.

In addition, the court agrees with the Government that Petitioner's challenge to Tuten's testimony at the plea withdrawal hearing is procedurally barred by his failure to raise the claim on direct appeal. "Under the procedural default rule, a defendant generally must advance an available challenge to a criminal conviction or sentence on direct appeal or else the defendant is barred from presenting that claim in a § 2255 proceeding." *Lynn v. United States*, 365 F.3d 1225, 1234 (11th Cir. 2004). In essence, Petitioner's claim is an evidentiary challenge to the court's admission of Tuten's testimony during the plea withdrawal hearing. That claim was available for Petitioner to raise on direct appeal. Petitioner did not raise the claim in his appellate brief, even though he challenged the court's denial of his motion to withdraw the plea and Tuten's failure to observe a discrepancy between his plea documents and his testimony during the plea colloquy. (*See* Eleventh Circuit Court of Appeals CM/ECF, Case No. 14-13459, Brief of Appellant Joseph Shane Terry, at 34-48 (Dec. 17, 2014)). Therefore, the procedural default rule bars Petitioner's claim against Tuten's testimony, unless an exception to the procedural default rule applies.

A claim does not fall under the procedural default rule if: (1) the petitioner can show cause for not raising the claim on direct appeal and actual prejudice from the error; or (2) the petitioner can show a constitutional violation that has probably resulted in the conviction of an actually innocent person. *Lynn*, 365 F.3d at 1234. Petitioner cannot make either showing. He has not claimed (or presented evidence to show) that he is actually innocent. *See id.* at 1235 (summarily rejecting actual innocence argument). Nor has Petitioner shown "that some objective factual external to the defense prevented [him] or his counsel from raising the claim[ ] on direct appeal." *Id.* Indeed, Petitioner's trial counsel raised attorney-client privilege objections to Tuten's testimony during the plea withdrawal hearing, and the court attempted to limit the Government's examination of Tuten to avoid any privilege issues. (*See* Criminal Docket, Doc. # 94 at 4-12, 169-79, 188-89, 199-200, 203-04, 206-07). If the court's rulings on attorney-client privilege objections presented a viable challenge to the denial of Petitioner's motion to withdraw his plea, Petitioner's appellate counsel easily could have raised that issue before the Eleventh Circuit. Petitioner has not claimed in this motion that his appellate counsel rendered ineffective assistance (and, it appears, with good reason). Therefore, after careful review, the court concludes that Petitioner's challenge to Tuten's testimony at the plea withdrawal hearing is procedurally barred from collateral review.

Alternatively, even if this claim were not procedurally barred (and, to be clear, it is), the court finds that Petitioner is barred from raising the claim by the collateral-attack waiver in his plea agreement. A collateral-attack waiver is enforceable if the petitioner knowingly and voluntarily waived his right to collateral review. *Demello v. United States*, 623 F. App'x 969, 972 (11th Cir. 2015). The Government proves that such a waiver is enforceable if "either (1) the district court specifically questioned the defendant concerning the sentence appeal waiver during

the plea colloquy, or (2) it is manifestly clear from the record that the defendant otherwise understood the full significance of the waiver." *Williams v. United States*, 396 F.3d 1340, 1341 (11th Cir. 2005) (alteration adopted) (quoting *United States v. Bushert*, 997 F.2d 1343, 1351 (11th Cir. 1993)). Here, Petitioner's plea agreement barred him from filing a direct appeal or post-conviction motion unless (1) his sentence exceeded the statutory maximum sentence, (2) his sentence exceeded the guidelines range calculated by the court, or (3) he raised an ineffective-assistance claim. (Criminal Docket, Doc. # 45 at 13-14). The court specifically questioned Petitioner about the collateral-attack waiver and told him that, unless an exception applied, it would "[waive] some if not all of your rights to appeal your conviction and sentence in this case or file a later lawsuit challenging your conviction and sentence in this case." (*Id.*, Doc. # 61 at 22-23). Petitioner affirmed that he understood the effect of the collateral-attack waiver and that he personally had decided to enter into it. (*Id.* at 23). The court ultimately found that Petitioner entered into a knowing and voluntary plea agreement. (*Id.* at 41). Accordingly, the government has demonstrated that the waiver is enforceable. *Williams*, 396 F.3d at 1341. As discussed above, Petitioner's challenge to Tuten's testimony is barred by the collateral-attack waiver because it is not an ineffective-assistance claim.

### E. Petitioner's Summary Ineffective-Assistance Claim Against Riggs is Meritless

In his motion to vacate, Petitioner contends that the Alabama Bar Association suspended and admonished Riggs in May 2013, before he entered a notice of appearance in this case. (Civil Docket, Doc. # 2 at 2). But Petitioner has wholly failed to specify which actions or omissions committed by Riggs prejudiced him. (*See generally id.*, Doc. # 2). Accordingly, the Government argues that Petitioner's ineffective-assistance claim against him should be summarily denied. (*Id.*, Doc. # 6 at 21). The court agrees.

In limited circumstances, federal courts of appeals have held that a defendant's Sixth Amendment right to counsel is violated when the defendant is represented by an individual who has never been eligible to practice law. *E.g.*, *United States v. Bergman*, 599 F.3d 1142, 1147-48 (10th Cir. 2010) (holding that a defendant's right to assistance of counsel was violated where the defendant was represented by an individual who never graduated from law school and never took a bar exam); *United States v. Novak*, 903 F.2d 883, 887 (2d Cir. 1990) ("In general, the Sixth Amendment guarantee is not satisfied if the accused is represented by a person who, for failure to meet substantive bar admission requirements, has never been admitted to the practice of law in any jurisdiction."). That *per se* Sixth Amendment rule generally is not applied to defendants represented by attorneys suspended from the practice of law because a suspension may result from incompetence, untrustworthiness, or a mere failure to comply with technicalities. *E.g.*, *United States v. Mitchell*, 216 F.3d 1126, 1132-33 (D.C. Cir. 2000) (declining to extend the *per se* rule to a defendant whose trial counsel was suspended from the practice of law). Petitioner has not claimed here that Riggs never received a license to practice law or that he never was qualified to become an attorney, so the *per se* Sixth Amendment rule applied in cases like *Bergman* and *Novak* is inapplicable. Moreover, the court is not convinced that Riggs' alleged suspension denied Petitioner the benefit of counsel because Petitioner was represented by another retained or appointed attorney throughout all of the proceedings. *Elfgeeh v. United States*, 681 F.3d 89, 93 (2d Cir. 2012). Indeed, Riggs candidly informed the court that Petitioner retained him for a limited purpose and that Petitioner needed the assistance of a criminal defense attorney for other purposes. (Criminal Docket, Doc. # 137 at 5-6). Petitioner has not pointed to any instance of deficient representation by Riggs, so the court cannot assess whether any of his

conduct violated the *Strickland* standard.  Accordingly, Petitioner's ineffective-assistance claim against Riggs is due to be denied.

### G.  Petitioner is Not Entitled to Discovery

In his reply brief, Petitioner asks to conduct depositions of at least three witnesses. (Habeas Docket, Doc. # 7 at 4-5).  Petitioner also moves for the court to subpoena (1) email records from David Estes, Tuten, and Riggs, (2) records from the Alabama Bar Association regarding Riggs' suspension, (3) Tuten's records regarding witness interviews, (4) records from the Madison County Sheriff's Office about an alleged domestic assault, and (5) phone records and recordings from the Madison County Jail.  (*Id.*, Doc. # 8 at 1-2, 4-6).  Finally, Petitioner asks the court to provide him a list of all subpoenas issued during his criminal proceedings.  (*Id.* at 3).

A habeas petitioner is not entitled to discovery unless he shows "good cause" for discovery.  *Bracy v. Gramley*, 520 U.S. 899, 904 (1997).  "Good cause is demonstrated 'where specific allegations … show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is … entitled to relief.'"  *Daniel v. Commissioner, Ala. Dep't of Corr.*, 822 F.3d 1248, 1281 (11th Cir. 2016) (quoting *Bracy*, 520 U.S. at 908-09). Petitioner's allegations completely fail to provide any basis for possible relief, for the reasons discussed at length above.  Therefore, the court finds no good cause for Petitioner's requested discovery, and his discovery requests are due to be denied.

### H.  Petitioner is Not Entitled to an Evidentiary Hearing

A petitioner under § 2255 is entitled to an evidentiary hearing if he alleges "reasonably specific, non-conclusory facts that, if true, would entitle him to relief."  *Aron v. United States*, 291 F.3d 708, 715 n. 6 (11th Cir. 2002).  The court need not hold an evidentiary hearing if a petitioner's claims are "affirmatively contradicted by the record" or "patently frivolous."  *Id.*

Here, the court need not hold an evidentiary hearing to resolve Petitioner's ineffective-assistance claims because they all are contradicted by the record or frivolous. Petitioner's claim that Brunson rendered ineffective assistance by not calling certain witnesses and not presenting certain evidence is contradicted by the record of Brunson's performance during the suppression hearing and the court's review of the evidentiary proffer Petitioner made in his *pro se* motion (which was supplemented by a counseled brief). Petitioner's ineffective-assistance claim regarding Brunson's statute-of-limitations argument is frivolous because his proposed interpretation of the WSLA is both meritless and unsupported by prior binding authority. Petitioner cannot show that Brunson's alleged refusal to cross-examine certain witnesses prejudiced him because the record reveals that Tuten replaced Brunson and received several months to prepare for trial prior to Petitioner's entry of a guilty plea. Nor can Petitioner show that Tuten's purported deficiencies prejudiced him because he testified under oath during the plea colloquy that he was satisfied with Tuten's performance and that he pled guilty because he actually was guilty. Petitioner's challenge to Tuten's testimony is barred from review for the reasons discussed above. Finally, Petitioner's ineffective-assistance claim against Riggs is frivolous because he has failed to specify how Riggs performed deficiently during his representation of Petitioner. Because all of Petitioner's claims are either contradicted by the record or frivolous, he is not entitled to an evidentiary hearing.

## III. Conclusion

Petitioner's ineffective-assistance claims fail on the merits, and his challenge to Tuten's testimony at the plea withdrawal hearing is barred from the court's review. Therefore, Petitioner's Motion to Vacate (Civil Docket, Docs. # 1, 2) is due to be denied without an

evidentiary hearing, and Petitioner's requests for discovery (*Id.*, Docs. # 7, 8) are due to be denied.  A separate Order consistent with this Memorandum Opinion will be entered.

**DONE** and **ORDERED** this July 19, 2018.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE